313 So.2d 293 (1975)
John B. BAQUE, Plaintiff and Appellee,
v.
PAN-AMERICAN LIFE INSURANCE COMPANY, Defendant and Appellant.
No. 4961.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1975.
Rehearing Denied June 18, 1975.
Writ Refused September 17, 1975.
*294 Dubuisson, Brinkhaus, Guglielmo & Dauzat by James T. Guglielmo, Opelousas, for defendant and appellant.
C. Kenneth Deshotel, Opelousas, for plaintiff and appellee.
Before FRUGE, CULPEPPER and DOMENGEAUX, JJ.
CULPEPPER, Judge.
Plaintiff seeks medical expense benefits under a school group accident policy issued by defendant. His minor son, Andrew Baque, was chasing a fly baseball at the school and ran into a metal post. The trial judge awarded plaintiff $1932.65 as the maximum benefits due under the policy, plus penalties in that same amount, and attorney's fees of $750 if the judgment was appealed, and $500 if not appealed. Defendant appealed. Plaintiff answered the appeal, seeking an increase in attorney's fees.
The defendant insurer had issued a "Student And Teachers School Term Accident Policy" to the Opelousas Catholic High School. The policy provided coverage "against loss resulting directly and independently of all other causes from accidental bodily injury (herein called injury) sustained while this policy is in force, subject to the terms and provisions contained herein." The "Eligible Expenses" for hospitals, doctors and other medical services are set forth in a schedule, and are further defined as those "required for treatment of cases of comparable severity and nature." (Emphasis supplied)
The defense is based on an exclusionary clause which provides:
"This policy does not cover any loss caused or contributed to, in whole or in part, nor is any premium charged for:
* * * * * *
"(4) * * * predisposing or pre-existing conditions or aggravation thereof;"
Defendant's basic contention is that most of the medical expenses were for the diagnosis and treatment of a pre-existing condition, i.e., premature ventricular contractions (PVCs) of the heart. The insurer offered to pay for those medical expenses which it considered to be a direct result of the accident, but it refused to pay for the expenses related to the diagnosis and treatment of the PVCs.
On March 7, 1973, Andrew Baque was practicing varsity baseball at Opelousas Catholic High School. While attempting to catch a fly ball, he ran into a metal post of the hurricane fence surrounding the practice fields. As a result of injuries to his chest and abdomen, Baque was taken to the office of Dr. S. J. Deshotels, a general surgeon.
After examining Baque, Dr. Deshotels immediately admitted him to St. Landry Clinic Hospital. The doctor's initial impression was that the boy had received trauma to the left lower chest and upper abdomen. He was primarily concerned about internal bleeding caused by a ruptured *295 spleen and/or kidney damage, and contusions to the lung and heart.
The boy remained in the Opelousas Hospital from March 7 to March 18. At the request of Dr. Deshotels, he was also seen there by Dr. W. J. Briley, a general practioner, and by Dr. Dudley Bienvenue, an internist. Dr. Briley examined the boy at least twice daily during his hospital stay in Opelousas and made progress reports each day. He testified that he began monitoring the boy's heart on March 8 by means of an electrocardiogram (EKG) and enzyme studies to rule out the possibility of a cardiac contusion. On that day, he did not feel that there were any clinical findings of cardio-vascular involvement, but stated that the boy should be watched for cardiac contusion.
On the third day following the accident, Dr. Briley began noticing premature ventricular contractions (PVCs) of the heart. He noted that these PVCs continued throughout the period of hospitalization in Opelousas. On March 12, he stated that he positively heard a friction rub, that sound detected by a doctor when there is an irritation of one segment of the heart or the lining, which will cause an abnormal heartbeat. Friction rubs are symptoms indicating that a patient has suffered a cardiac contusion. Dr. Briley also noted an elevation of enzyme levels, indicating to him the possibility that heart muscles may have been bruised.
Dr. Briley testified that he thought the PVCs resulted from trauma. He stated that he did not know if the patient had irregular heartbeats before the March 7 accident. He had seen the boy previously in 1972 to examine him before fall football practice and found no irregular heartbeat. He also found no heart problems upon examination in 1970 prior to surgery.
The only evidence which indicated to Dr. Briley that the PVCs may have been a pre-existing condition was a statement to him by the patient. On March 13, Andrew Baque told Dr. Briley that once when he was at home, prior to this accident, he felt his heart thump at night. From this the doctor concluded there was a "possibility" that the PVCs pre-existed the accident. However, his final diagnosis was that considering the severe contusion of the chest and abdomen, the friction rubs, the enzyme elevation and the PVCs, the boy suffered a cardiac contusion "probably" resulting from the March 7 accident.
Dr. Bienvenue saw the Baque boy in consultation with Dr. Briley beginning on the third or fourth day following the injury. He found no friction rubs. However, he noted the PVCs from the EKG report. His initial impression was that the boy suffered a probable myocardial contusion. He saw the patient four or five times during the period of hospitalization and noted the persistence of the PVCs. Although he felt that the boy may have had PVCs prior to his accident, his final diagnosis was myocardial contusion resulting from the accident.
Dr. Deshotels examined the boy during his entire stay at the Opelousas Hospital. When the boy was first seen by Dr. Deshotels in his office prior to admission, he noted that Andrew had suffered a blunt trauma to the left lower chest and upper abdomen. He noted the possibility of a bruised heart. Upon admission to the hospital, he ordered the monitoring of the boy's heart by an electrocardiogram and other heart tests. He continued to see the boy on a daily basis in the Opelousas Hospital. Dr. Deshotels stated positively that he heard the PVCs on the first day. The doctor testified that the PVCs continued throughout the period of hospitalization. However, he heard no friction rubs. His initial impression was that the boy suffered a cardiac contusion.
Dr. Deshotels could not say whether or not the PVCs were a pre-existing condition. However, he testified in his opinion the PVCs were caused by the trauma and that they were not pre-existent.
Dr. Deshotels referred young Baque to Dr. Leatherman in Houston on March 18. *296 Upon admission to St. Luke's Episcopal Hospital, Dr. Leatherman noted the irregular heartbeats which he attributed to the PVCs. He found no friction rubs. He did not regard the enzyme elevation as significant because they could have been secreted by muscles in the trauma area other than heart muscles.
Dr. Leatherman stated that the boy was not treated for trauma in Houston. However, he said "They were referred to Houston, following a conversation with Dr. Deshotels, because of possible cardiac trauma." Baque was examined to determine possible heart involvement related to the PVCs. He testified that there can be a number of causes for heartbeat irregularity. He characterized the PVCs as idopathic, i.e., the doctors know that the PVCs are occurring, but they do not know the reason. After tests and examinations he concluded the PVCs in this case were not related to the accident. He felt that they were pre-existent. Nor did he believe that trauma suffered by young Baque could have aggravated this pre-existing condition. The doctor concluded that the PVCs were of no clinical importance. However, he prescribed medication to reduce their frequency.
It was also Dr. Leatherman's opinion that the boy did not suffer a cardiac contusion. His conclusion was based upon these facts: (1) There was no overt evidence of chest trauma; (2) there were no fractured ribs; (3) the enzyme elevations were not specific to heart muscles; and (4) there was no evidence of friction rubs. Andrew Baque was released from the Houston hospital on March 22. He made a return visit to Dr. Leatherman's office on June 6. After examination, the doctor released the boy from his care.
Although the trial judge held that the defendant insurer had failed to prove a pre-existing condition or the aggravation thereof, he stated in his written reasons for judgment that "it is apparent that the boy simply hurt himself, was brought to the hospital, put through diagnostic regimes and then it was determined that as part of the traumatic injury, he suffered or had some cardiac involvement. The PVC's were apparently of no consequence with respect to the trauma, and the Court is of the opinion that whether he had PVC's before or after the injuries, the doctors would have kept him in the hospital and checked him out on the chance that he did have cardiac involvement because "of the blow to the chest." He continued, saying: "really the only question of a legal nature that presents itself is whether the policy holder is entitled after a severe trauma to be hospitalized and have the necessary diagnostic studies made to determine what he has, even though they become of a somewhat extended nature."
"It is the opinion of this Court that all of the hospitalization and investigation by the doctors was necessary to determine what the patient had, and that the insurance company owes this to the patient to find out how much injury he has suffered. When it results in a diagnosis of `covered' injury, as it did in this case, then there should seem to be no argument about coverage, as the only way the doctors could affirmatively see what the pateint had was to take the time and effort to determine what he didn't have; and, so long as the investigation is reasonable and the process of elimination is used to determine what he did have; and, the conclusion is that he had something that was covered by the policy, it would seem that the insurance company is liable for all of the medical and hospital expenses."
Pan-American Life Insurance Company insured the students at this high school "against loss resulting directly and independently of all other causes from accidental bodily injury (herein called injury) sustained while this policy is in force, subject to the terms and provisions contained herein." The definition section of the policy defines eligible expenses to mean "loss from actual, necessary and customary fees and prices generally charged in the state *297 where performed for usual services and supplies required for treatment of cases of comparable severity and nature." (emphasis supplied)
Although the Louisiana jurisprudence reveals no case defining "treatment", we find applicable the following definition of that term by the courts of sister states: "In common parlance and often in the law, `treatment' is the broad term covering all the steps taken to effect a cure of the injury or disease. It includes examination and diagnosis, as well as application of remedies", Hester v. Ford, 221 Ala. 592, 130 So. 203, 206 (1930). See also Stephens v. Williams, 226 Ala. 534, 147 So. 608 (1933); Kirschner v. Equitable Life Assurance Society, 157 Misc. 635, 284 N.Y.S. 506, 510 (1935); Permanent Edition, Words and Phrases, Volume 42A, Treatment, p. 45. We believe that the foregoing definition of the word "treatment" accords with logic and common sense.
In effect, defendant is contending the policy excludes diagnostic tests and procedures which, although reasonably necessary to determine the nature and extent of accident related injuries, ultimately reveal other conditions which pre-existed the accident. Under this theory, all x-rays, laboratory tests, consultations with specialists, etc., which are negative for accident related conditions, would be excluded. This is not a reasonable or logical interpretation of the "treatment" the policy provides.
The trial judge held that the final conclusion reached by Dr. Leatherman was immaterial and that the essential question is whether the examination and diagnostic studies in Opelousas and Houston were reasonably necessary to determine the cause, nature and extent of cardiac involvement by Young Baque suffered as a result of his accident. We agree.
The evidence clearly establishes that the doctors' examinations, diagnostic studies and treatment were reasonably necessary to determine the cause, nature and extent of cardiac involvement suffered by this young man as a result of his accident. This is all part of the "treatment" covered by the policy. Therefore, we conclude that the maximum benefits are due under the policy for all of the medical expenses incurred in Opelousas and in Houston.
STATUTORY PENALTIES
Next we must decide whether statutory penalties should be allowed under LSA-R.S. 22:657. Andrew Baque was hospitalized continuously in Opelousas and Houston from the date of his accident on March 7 until March 22. The insurer's agent, Mrs. Gloria R. Marx, acknowledged receipt of the initial claim form on April 6. Included with the initial claim was the report and bill of Dr. Deshotels and the bill from St. Luke's Hospital in Houston. In his report, Dr. Deshotels rendered a final diagnosis of "cardiac contusion and blunt trauma to chest." He also indicated that the patient had been referred to Dr. Leatherman in Houston. The St. Luke's bill indicated that an EKG, a cardiac series and a cardio-scan had been run on the boy's heart. As a result, Mrs. Marx says she became suspicious and began to investigate the claim to determine whether it was due to accidental injury.
On April 10, the insurer's agent wrote to Dr. Bienvenue requesting his report. His report and bill were received by the agent on April 19. Dr. Bienvenue diagnosed the patient's condition as "myocardial contusion". The agent received Dr. Briley's report on May 17 with his diagnosis of "severe contusion of chest and abdomen. Prob. cardiac contusion." He also indicated the patient's transfer to the Houston hospital.
After receiving Dr. Briley's report, Mrs. Marx claims that she spoke with the Baques and explained that she would need a medical authorization to secure the medical records from St. Luke's Hospital and St. Landry Hospital. She says that she *298 sent an authorization form to the parents but it was returned to her unsigned. However, this unsigned form was not introduced in evidence, nor is there any other written evidence to indicate that the Baques had been sent authorization forms at this time.
Mrs. Marx testified that she received Dr. Leatherman's bill from the medical clinic in Houston on July 5 with a diagnosis of "cardiac arrhythmia" written across the face of the bill. Dr. Leatherman did not attach his report. She says she knew cardiac arrhythmia is a disorder of the heart having any number of causes.
On July 11, she spoke with Dr. Leatherman on the telephone. She says he refused to complete an accident claim form but agreed to send a narrative report upon receipt of authorization from the parents to release medical information. On July 12, the parents were sent an authorization form attached to a letter indicating that the form was necessary to secure a report from Dr. Leatherman. Mrs. Baque signed the form on July 14, and it was received by Mrs. Marx shortly thereafter.
On July 20, she wrote Dr. Leatherman requesting his report, which she received on August 5. About the same time she received the St. Luke's medical records and reviewed the Baques' claim with the insurer's claims director. Upon the basis of all information received, a decision was made to pay 50% of the medical expenses incurred in Opelousas. On August 16, a draft in the amount of $830.07 was mailed to the Baques which they refused to accept in payment of their claim.[1] Suit was filed on August 21.
R.S. 22:657 provides in part:
"All claims arising under the terms of health and accident contracts issued in this state, except as provided in Subsection B, shall be paid not more than thirty days from the date upon which written notice and proof of claim, in the form required by the terms of the policy, are furnished to the insurer unless just and reasonable grounds, such as would put a reasonable and prudent business man on his guard, exist.... Failure to comply with the provisions of this Section shall subject the insurer to a penalty payable to the insured of double the amount of the health and accident benefits due under the terms of the policy or contract during the period of delay, together with attorney's fees to be determined by the court."
The insurer contends that its agent had "just and reasonable grounds, such as would put a reasonable and prudent business man on his guard" for refusing payment of the claim 30 days beyond April 6, 1973. Mrs. Marx claims that the St. Luke's hospital bill indicated a heart disorder which might not be related to the accidental injury. However, she had Dr. Deshotels' report on the same day indicating a positive diagnosis of cardiac contusion caused by blunt trauma to the chest. By May 17, she had received all of the reports from the Opelousas doctors indicating chest trauma and a cardiac contusion. It should have been obvious to Mrs. Marx at this point that at least all of the medical expenses incurred in Opelousas were related to the trauma from the boy's accident. Yet, the insurer did not offer to pay any of the medical expenses until the middle of August, more than four months from the date of the initial claim, and then only offered to pay 50% of the medical expenses incurred in Opelousas.
Nevertheless, Mrs. Marx contends that payment is normally delayed until the reports of all treating doctors have been received. She testified that she was aware of the statute requiring payments within 30 days, but she felt that she had reasonable grounds to delay payment until she received all of the medical information. She *299 claims that the delay in securing Dr. Leatherman's report was caused by the failure of the Baques to sign a form authorizing the release of medical information to the insurer. She first learned that Dr. Leatherman had treated plaintiff's son on April 6. Even accepting her testimony, she did not request the Baques to sign an authorization form until some time after she received Dr. Briley's report on May 17. She did not request the Baques to sign an authorization to get Dr. Leatherman's report until July 12. It was signed by Mrs. Baque two days later and promptly returned.
There was no reason for Mrs. Marx to delay from April 6 to May 17 her request that the Baques sign a medical authorization. She had Dr. Deshotels' report. She knew that young Baque had been treated in two hospitals. She knew by April 6 that Dr. Leatherman had examined the boy. Someone who has been in the business of school insurance as long as Mrs. Marx certainly should have known that a medical authorization form would be required to secure the immediate release of medical information to the insurer.
We find appropriate the following language from Phelps v. Southern National Insurance Company, 83 So.2d 463, 468 (2d Cir. 1955):
"Nor do we think defendant should escape liability for the penalty because in the instant case it misinterpreted both the cause of plaintiff's illness and the legal effect of its policy provisions. A defendant insurer must take the risk of its misinterpretations of its policy. Ayres v. New York Life Ins. Co., 219 La. 945, 54 So.2d 409."
In Fontenot v. Wabash Life Insurance Company, 243 La. 1049, 150 So.2d 10, 12 (1963), our Supreme Court affirmed an award of penalties and explained the reasoning and public policy embodied in the statutory penalties:
"Insurance companies, and not the insured, prepare the contracts of insurance; and health and accident policies in particular should as far as possible, be free from ambiguities and uncertainties so that the insured, usually an ordinary layman, can tell whether any sum is due to him as a result of accident or sickness. If such a policy is vague and uncertain as to the extent of coverage, and if because of such uncertainty sick benefits and hospital charges are not paid and the insured must resort to the courts to ascertain the meaning of the policy, then, in effect, he is being denied the benefits of the insurance at a time when most neededthat is, at the time of accident or resultant bodily injury or sickness; at a time when such benefits are needed to provide the insured with essential medical and hospital care which possibly due to his financial condition would be denied to him without such insurance. It is for these reasons that health and accident policies should be written in such clear terms that a misinterpretation of the insurance company's liability could not occur."
The insured has resorted to the courts to determine the extent of coverage under the policy. Under the insurer's interpretation of its policy, the Baques would have been required to run the risk that the post-accident examinations, diagnostic studies and treatment might eventually result in a final diagnosis that their son suffered from a pre-existing condition not covered by the policy. Even medical experts could not agree that the boy's cardiac involvement was caused by a pre-existing condition. To the contrary, all agreed that their examinations, diagnostic studies and treatment were conducted to determine possible cardiac trauma resulting from the accident. Therefore, we conclude that the failure of the insurer to pay plaintiff's claim within 30 days of proper notice was unreasonable, and the assessment of penalties and attorney's fees by the trial court was correct.
*300 ATTORNEY'S FEES.
The judgment of the district court awarded attorney's fees in the amount of $750 if appealed, and $500 if not appealed. Plaintiff answered the appeal asking that the award be increased to $3500.
Although the amount of attorney's fees rests largely within the discretion of the trial judge, factors deemed worthy of consideration include the amount involved, the skill of the attorney, and the amount of work necessarily undertaken by the attorney. See Niles v. American Bankers Insurance Company, 229 So.2d 435 (La.App. 3rd Cir. 1970); Ray v. Superior Ironworks & Supply Company, Inc., 284 So.2d 140 (La.App.3rd Cir. 1973).
Plaintiff's attorney filed many pleadings on behalf of his clients. On February 15, 1974, he flew to Houston and took Dr. Leatherman's deposition. He spent 10 hours in March and April of 1974 talking to his clients and their witnesses in preparation for trial. He attended a pretrial conference and spent about five hours preparing a pretrial memorandum requested by the trial judge. The case was tried separately on two different days. Counsel has also spent considerable time in responding to defendant's appeal. The record on appeal contains 427 pages. The amount involved, including penalties, totals approximately $3800. We also note that this case has been extremely hard fought on both sides. Therefore, we will increase the attorney's fees awarded to $1500.
For the reasons assigned, the judgment appealed from is amended so as to increase the award of attorney's fees to the sum of $1500. Otherwise, the judgment is affirmed. All costs of the trial and appellate courts are assessed against defendant.
Affirmed as amended.
NOTES
[1] Another draft for $671.08 was sent on January, 11, 1974, but was not endorsed or cashed by the Baques.